**FOR PUBLICATION**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

UNALACHTIGO BAND OF THE :
NANTICOKE-LENNI LENAPE :
NATION, :
                               :
         Plaintiff, :
                               :
     v. :
                               :     Hon. Joseph H. Rodriguez
STATE OF NEW JERSEY & :
HONORABLE JON S. CORZINE, :     Civil Action No. 05-5710
Governor of the State of New Jersey, :
in his individual capacity, :     **OPINION**
                               :
         Defendants, :
                               :
     and :
                               :
STOCKBRIDGE-MUNSEE COMMUNITY, :
BAND OF MOHICAN INDIANS & :
POWHATAN INDIANS OF DELAWARE :
VALLEY, d/b/a POWHATAN RENAPE :
NATION, :
                               :
     Intervenors. :
_____ :

**RODRIGUEZ**, SENIOR DISTRICT JUDGE:

      This matter comes before the Court on the motion of Intervenor Stockbridge-

Munsee Community, Band of Mohican Indians ("the Stockbridge-Munsee") to dismiss

the Amended Complaint under Rule 19 of the Federal Rules of Civil Procedure for failure

to join a necessary and indispensable party.[1]  For the reasons discussed below, the

---

1     This motion was actually filed in conjunction with a motion to intervene for the limited
purpose of seeking this action's dismissal.  The Court, in an Order dated December 19, 2006,

Stockbridge-Munsee's motion is denied.  Nonetheless, the case is dismissed because Plaintiff Unalachtigo Band of the Nanticoke-Lenni Lenape Nation ("Plaintiff") lacks standing.

## I.  BACKGROUND

### A.  Premise and Procedural History of this Action

Plaintiff is an Indian tribe, albeit one that is unrecognized by either the State of New Jersey or the United States government.  Instead, it is organized as a New Jersey non-profit corporation.  It claims to be the successor in interest to an Indian group for which the Colony of New Jersey set aside a tract of land in Burlington County in 1758. This land came to be known as the Brotherton Reservation.  Plaintiff alleges the State of New Jersey unlawfully sold the reservation in 1801 by failing to seek and receive congressional approval of the sale pursuant to the requirements of the Indian Nonintercourse Act, which is now codified at 25 U.S.C. § 177.[2]

In December 2005, Plaintiff filed its Complaint, essentially seeking to reclaim the reservation.  It named as Defendants several agencies and officials in Burlington County (collectively "the Burlington County Defendants").  Although the Burlington County Defendants filed their Answer shortly thereafter, Plaintiff eventually stipulated to their

permitted the Stockbridge-Munsee to intervene, but reserved decision on the motion to dismiss.

2      In its current form, the Indian Nonintercourse Act provides in relevant part: "No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution."  25 U.S.C. § 177 (2001).

dismissal and filed an Amended Complaint in which it named as Defendants the State of New Jersey and Governor Jon S. Corzine (collectively "the State Defendants").

In the Amended Complaint, Plaintiff repeats its primary claim that the State alienated the Brotherton Reservation in violation of the Indian Nonintercourse Act.  It also adds claims for breaches of contract and fiduciary duty based on the Reservation Trust Act, a provincial law passed on August 12, 1758 that made official the Colony's purchase of Brotherton for the Indians.  Thus, Plaintiff seeks a declaration voiding the reservation's sale, as well as a finding that the State breached its contractual and fiduciary obligations.  It also seeks an award of various damages and fees.

The State Defendants responded by moving under Federal Rules 12(b)(1) and (6) to dismiss the Amended Complaint for lack of subject matter jurisdiction and failure to state a claim.  The motion was not decided, however, because it was withdrawn without prejudice after another Indian tribe–the Stockbridge-Munsee–intervened and filed its motion to dismiss under Rule 19.[3]  In essence, the Stockbridge-Munsee claims the Brotherton Indians merged with it in 1802, making it the rightful successor to the reservation.  Thus, based on its claimed interest in Brotherton, the Stockbridge-Munsee

---

3       The Stockbridge-Munsee was not the only Indian tribe to intervene in this action. Another group called the Powhatan Renape Nation also intervened in order to protect its interest in its own reservation after Plaintiff publicly indicated a desire to accept parkland surrounding the reservation as part of a settlement with the State.  The Powhatan Renape Nation takes no position with respect to the matters at issue in this Opinion.

argues it is a necessary party that must be joined under Rule 19(a).[4]  Moreover, because it

declines to waive its sovereign immunity,[5] it maintains it cannot be joined and this action

should be dismissed under Rule 19(b).[6]

     Plaintiff opposes the Stockbridge-Munsee's motion for two reasons.  First, it

contends the Stockbridge-Munsee is not a successor to the Brotherton Indians and

therefore lacks an interest in this litigation.  Second, it alternatively argues the

Stockbridge-Munsee waived its sovereign immunity by moving to intervene and therefore

can be joined as a party.

---

[4]     In relevant part, Rule 19(a) requires a person to be joined as a party if:

> that person claims an interest relating to the subject of the action and
> is so situated that disposing of the action in the person's absence
> may: (i) as a practical matter impair or impede the person's ability to
> protect the interest; or (ii) leave an existing party subject to a
> substantial risk of incurring double, multiple, or otherwise
> inconsistent obligations because of the interest.

FED. R. CIV. P. 19(a)(1)(B).

[5]     The Stockbridge-Munsee is a federally recognized tribe.  See 67 Fed. Reg. 46328 (July 12, 2002).  It argues it is therefore protected from suit by the doctrine of tribal sovereign immunity.  See, e.g., Wilbur v. Locke, 423 F.3d 1101, 1114 (9th Cir. 2005) ("Federally recognized Indian tribes enjoy sovereign immunity from suit, and may not be sued absent an express and unequivocal waiver of immunity by the tribe or abrogation of tribal immunity by Congress.").

[6]     Rule 19(b) provides, in relevant part: "If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  FED. R. CIV. P. 19(b).

In February 2007, the Court indicated its desire to determine if either Plaintiff or the Stockbridge-Munsee is a successor in interest to the Brotherton Indians. To help resolve this question, the Court granted the New Jersey Land Title Association's ("NJLTA")[7] motion to act as *amicus curiae* and directed that organization to brief the tribal successorship issue.

The Court also inquired of both Plaintiff and the Stockbridge-Munsee whether they wished to submit additional historical evidence on the successorship issue. At a hearing in February 2007, Plaintiff indicated that it had submitted all the necessary documentation. See Hearing Tr., 2/14/07, 31:2-13. For its part, the Stockbridge-Munsee briefly considered submitting additional historical evidence in support of its claim, but ultimately declined to do so.[8] See Stockbridge-Munsee Ltr. to the Court, 3/2/07.

Meanwhile, the NJLTA submitted the requested *amicus* briefing. It agreed with the Stockbridge-Munsee's basic merger theory, but nonetheless expressed doubt regarding whether any tribe actually succeeded the Brotherton Indians.

---

[7]     The NJLTA is a trade organization which is "organized to advance the common interest of all those engaged in the field of evidencing title to real property, conveyancing, and insuring interests therein . . . ." NJLTA Br., 7/21/06, p. 2.

[8]     In declining to submit additional documentation, the Stockbridge-Munsee apparently believed the Court sought to adjudicate the merits of its title claims. See Stockbridge Ltr. to the Court, 3/2/07. This is not the case, however. Instead, the Court simply intends to identify whether Plaintiff, the Stockbridge-Munsee, or both is a successor to the Brotherton Indians. The necessity of answering this question is made plain by the Stockbridge-Munsee's own moving brief, which devotes fifteen pages to demonstrating that it is the "sole successor in interest" to the Brotherton Reservation. Stockbridge-Munsee Br., pp. 4-19.

Thus, the central question is which entity, if any, is a successor in interest to the

Indian group for which the Brotherton Reservation was established.  In order to properly

understand this issue, it is essential to review the available and relevant history of New

Jersey's native population and the Brotherton Reservation itself.

B.  Relevant History Regarding
New Jersey's Indians and the Brotherton Reservation

New Jersey's aboriginal people were known as the Lenape or Delaware Indians.[9]

It is a mistake, however, to classify the Lenape people as being members of a single entity

because they never belonged to one unified tribe or political unit.  Goddard:1, <u>supra</u>, 213;

---

[9]     It should be noted that "Delaware" is not an Indian word.  In the early seventeenth century, an English explorer sailed into the bay that he subsequently would name after one Sir Thomas West, third Lord De la Warre.  HERBERT C. KRAFT, THE LENAPE-DELAWARE INDIAN HERITAGE: 10,000 BC TO AD 2000 8 (Lenape Books 2001).  The Indian bands living on this bay, and the river draining into it, subsequently were identified by the English as the "Indians on the De la Warre Bay" or the "Indians on the De la Warre River."  <u>Id</u>.  In time, these Indians came to be known simply as the "Delaware."  <u>Id</u>.

        Somewhat confusingly, the name Delaware was originally applied only to the Lenape people living in the middle Delaware Valley, Ives Goddard, *Delaware*, *in* 15 HANDBOOK OF NORTH AMERICAN INDIANS 213, 213 (Smithsonian Inst. 1978) (hereinafter "Goddard:1"), who were also generally referred to as the Unami, <u>see</u> KRAFT, <u>supra</u>, 8.  However, the modern descendants of the other principal branch of the Lenape tree–the Munsee–also sometimes identify themselves as Delaware.  <u>Id</u>.  This is because the name was eventually extended to cover both the Unami and the Munsee, though only after the various Lenape people had largely migrated away from their traditional eastern homelands.  Goddard:1, <u>supra</u>, 213.  Thus, modern ethnologists now tend to use the terms "Delaware Indians" and "Lenape Indians" synonymously, C.A. WESLAGER, THE DELAWARE INDIANS: A HISTORY 33 (Rutgers Univ. Press 1972), which destroys the original Unami/Munsee distinction that was inherent in the colonial usage of the name Delaware.  Recognizing this, at least one researcher reserves the name for only the Unami Lenape.  <u>See</u> KRAFT, <u>supra</u>, 8.  As will be discussed in the text that follows, the Unami/Munsee distinction is important to this litigation, and the Court will similarly limit its use of the term "Delaware" to refer only to the Unami Lenape.

6

KRAFT, supra, 4, 6; WESLAGER, supra, 42.  Instead, at the time of European contact, the

Lenape Indians actually formed many distinct political entities, see WESLAGER, supra, 32-

33, which, despite their independence from one another,[10] shared certain cultural and

linguistic characteristics, Goddard:1, supra, 213.  These similarities served to distinguish

the Lenape people from other Indians in the mid-Atlantic and Northeastern regions of

what would become the United States.  KRAFT, supra, 6.

In general terms, the Lenape Indians were historically categorized into two

groupings, based on geographic and dialectal patterns.  Goddard:1, supra, 213; KRAFT,

supra, 4.  In the northern part of the Lenape area–northern New Jersey and southeastern

New York–were the bands whose members spoke the Munsee dialects.  Goddard:1,

supra, 213; KRAFT, supra, 4.  In the eighteenth century, the name "Munsee" was applied

generally to all Munsee-speaking bands who had formerly lived north of the Raritan

River.  KRAFT, supra, 7.

South of the Delaware Water Gap and Raritan Valley, in what now includes

central and southern New Jersey, eastern Pennsylvania, and Delaware, were the Lenape

---

10      Each Lenape village was a politically independent community. WESLAGER, supra, 32-33,
37.  These communities would often cooperate with one another for the purposes of hunting,
defense, and diplomacy with other Indians or the Europeans.  Goddard:1, supra, 216.  In some
cases, multiple villages located in a particular area even consolidated into "what can best be
described as a band, and the most influential village chief may have functioned as the nominal
head of the band."  WESLAGER, supra, 33.  Nonetheless, "[t]o refer to the [Lenapes] at the time
of white contact as a tribe would seem to be a misapplication of the term . . . ."  Id. at 42
(emphasis in original).

groups that spoke the Unami dialects.[11]  Goddard:1, supra, 215; KRAFT, supra, 4.  During the 1700s, the term "Unami" spread rapidly as a convenient designation for all Indians in New Jersey who lived south of the Raritan River.  KRAFT, supra, 7.

The various Lenape bands, as they existed before European contact, did not remain static or unchanged.  Instead, "European colonization, epidemic diseases, warfare, alcoholism, and other disruptive factors led to the disintegration of these original groups." KRAFT, supra, 4.  Thus, the former band structures disappeared.  WESLAGER, supra, 43. The remaining individuals combined with other remnant populations to form new bands. KRAFT, supra, 4.  As European settlement continued its encroachment, these new groups began migrating west into the Pennsylvania frontier and beyond.  See Goddard:1, supra, 221-222; KRAFT, supra, 450, 452-53.

Not all Lenape people left their original homeland; a few groups remained behind in New Jersey.  WESLAGER, supra, 261; Goddard:1, supra, 222.  These remaining groups were separate from and independent of those who had already moved westward.

---

11      Linguists have subdivided the Unami speakers even further.  It appears there were people who spoke a southern Unami dialect and lived in the area below Trenton and Toms River, extending into Pennsylvania and eastern Delaware.  KRAFT, supra, 7, 206; Ives Goddard, *Eastern Algonquin Languages*, *in* 15 HANDBOOK OF NORTH AMERICAN INDIANS 70, 73 (Smithsonian Inst. 1978) (hereinafter "Goddard:2"); Goddard:1, supra, 214-15.  Likewise, there were people using a northern Unami, or Unalachtigo, dialect who lived in the area between the southern Unami groups to the south and the Munsee groups to the north.  KRAFT, supra, 7, 206; Goddard:2, supra, 73; Goddard:1, supra, 214-15.  However, some researchers classify Unalachtigo as a dialect that was separate and distinct from Unami, but whose speakers eventually merged with the linguistically similar Unami speakers.  See WESLAGER, supra, 45. Ultimately, understanding the intricacies of Lenape linguistics is not essential to the disposition of this motion; instead, it suffices to recognize the basic distinction between Unami and Munsee.

WESLAGER, supra, 261.  By the mid-eighteenth century, however, the remaining groups

constituted nothing more than an "insignificant minority."  KRAFT, supra, 440.  Indeed,

New Jersey Governor Francis Bernard noted in late 1758 that "an exact return" made to

him indicated that only 270 Indians remained in the province.  EDWARD MCM.

LARRABEE, RECURRENT THEMES AND SEQUENCES IN NORTH AMERICAN INDIAN-

EUROPEAN CULTURE CONTACT 11 (Am. Philosophical Soc'y 1976).  This is particularly

striking when compared to the estimated 3,000 to 4,000 Lenape Indians who lived in New

Jersey prior to European contact.  See WESLAGER, supra, 42.

   In addition to being drastically reduced in numbers, New Jersey's remnant Indians

saw significant changes to their historic ways of life during the eighteenth century.  They

no longer resided in their traditional villages, but instead "were scattered in rural areas, a

few families, others there, usually housed in wretched cabins."  Id. at 261.  To say the

least, their economic and social situations were often grim, with one researcher

characterizing them as "a pitiful, ragged, and landless people almost continually harassed

by white settlers . . . ."  KRAFT, supra, 441.  Nonetheless, the remnant Indians kept to

themselves and, for a while, the New Jersey government paid them little attention.

WESLAGER, supra, 261.  This apatetic attitude would soon change, however.

   As the economic situation of the remaining New Jersey Lenape worsened,

Presbyterian adherents took an interest in them.  Id.  One particular organization, the

Society for Propagating Christian Knowledge, sent a missionary named David Brainerd to

live and work among the Indians.  KRAFT, supra, 441.  He first spent a year

unsuccessfully ministering to various Indian groups in Pennsylvania.  See WESLAGER,

supra, 262.  In 1745, however, he turned his attention to working with the remnant bands

of Unami in southern New Jersey.  Id.  He settled and began his mission at a place called

Crosswicks,[12] where several Indian families lived.  Id.  By March 1746, the Lenape

population at Crosswicks increased to between 130 and 150 persons.  Id. at 263;

LARRABEE, supra, 5.

The land at Crosswicks was insufficient to support its growing Indian population.

WESLAGER, supra, 263.  Moreover, local colonists were apprehensive about the Indians'

presence, and continually harassed the group.  KRAFT, supra, 441.  Most, though not all,

of the Crosswicks Indians therefore moved about fifteen miles northeast to a site near the

town of Cranbury, a site which Brainerd called Bethel.  Id.; WESLAGER, supra, 263.  By

the mid-eighteenth century, the Indians who lived there came to be known by colonists as

the "Cranbury band," or the "Bethel Indians."  LARRABEE, supra, 5.

After David Brainerd's death in 1747, his brother John, who was also a minister,

carried on with the mission at Cranbury.  WESLAGER, supra, 263.  Unfortunately,

however, the Cranbury band continued to suffer harassment from nearby colonists.

KRAFT, supra, 441.  Consequently, John Brainerd attempted to acquire new land where

---

12   Crosswicks was a place near present-day Bordentown, New Jersey, about ten miles
southeast of Trenton. WESLAGER, supra, 262.

the Indians could live in peace and security.  WESLAGER, supra, 263.  To this end, the

Society for Propagating Christian Knowledge approved an effort to purchase some four

thousand acres for a new Indian community.  LARRABEE, supra, 7.  Likewise, a Quaker

group called the New Jersey Association for Helping Indians offered additional financial

assistance for the reservation effort.  WESLAGER, supra, 263.

Despite sectarian support, the plan for a new community did not come

immediately to fruition, mainly because of the outbreak of the French and Indian War.

Id.  This conflict constituted a major crisis for the New Jersey provincial government and

forced it to take action on Indian affairs.  It also occasioned a split among the Delaware

people who had previously moved west, with some fighting for the English and others

fighting alongside the French.  KRAFT, supra, 456.  Although New Jersey was some

distance from the fighting in the Pennsylvania frontier, there were reports of murders by

the French and their Indian supporters near the province's borders.  WESLAGER, supra,

263.  Later, Delaware war parties aligned with the French actually crossed into New

Jersey, and attacked individual farms and small colonial settlements.  KRAFT, supra, 457-

58.  In this environment, the government of New Jersey declared war on, and offered

scalp bounties for, the hostile Delaware Indians.  See id. at 464.

The Cranbury band was not officially targeted by the New Jersey government; the

declaration of war extended only to hostile Delawares aligned with the French.  See

WESLAGER, supra, 264.  Nonetheless, the Bethel Indians there were concerned for their

11

safety at the hands of both the colonists (who regarded all Indians as enemies) and the hostile war parties.  Id. at 263.  In response, the provincial government passed a law that required non-hostile Indians to register with a local magistrate and obtain a letter identifying them as friendly.  See LARRABEE, supra, 7.  The law further directed the friendly Delaware to wear a red ribbon in order to distinguish themselves from their hostile counterparts.  See id.  Finally, the peaceful Indians were prohibited from crossing the Delaware and Raritan Rivers to join the war parties.  KRAFT, supra, 464.

After several months, the English colonies negotiated a peace treaty with the formerly hostile Delaware groups, and the New Jersey government rescinded its declaration of war.  WESLAGER, supra, 264-65.  Despite this cessation of hostilities, many settlers were still apprehensive about potential Indian attacks.  See id. at 265.  Additionally, influential Quaker and Presbyterian leaders believed that New Jersey's Indians had been mistreated by the colonists, which largely caused the Indians' hostility in the first place.  Id.  There was also a sense that the remaining Indians were themselves growing discontented with their dire economic and social circumstances.  See id.  For all these reasons, the New Jersey government decided to "right the wrongs and prevent further bloodshed in the province."  Id.  It therefore appointed commissioners to examine the historic treatment of the Indians.  Id.

The commissioners held a preliminary conference with various Unami leaders in January 1756 at Crosswicks.  KRAFT, supra, 466; LARRABEE, supra, 7.  After hearing the

Indians' grievances, the commissioners reported their findings to the provincial legislature. WESLAGER, supra, 265. It, in turn, passed a series of laws in 1757 intended to protect the Indians, for example, by prohibiting their imprisonment for debts. Id.

The commissioners also learned that New Jersey had a serious problem relating to Unami land claims. The Delaware, mostly settled at Cranbury with a few remaining at Crosswicks, had no title to the lands they occupied. WESLAGER, supra, 265. As such, they feared the colonists would drive them away from their settlements. Id.

Later, in February 1758, the commissioners held a second meeting at Crosswicks, which was attended by about thirty Delaware representatives. KRAFT, supra, 466. These included a "distinct group" of resident New Jersey Indians–mostly from Cranbury and Crosswicks–and some Indians who had already moved west. LARRABEE, supra, 8; see WESLAGER, supra, 265. The Indians signed a release confirming they had no further land claims south of the Raritan River, except for twenty-two specific tracts. LARRABEE, supra, 8. Since these claims required additional investigation, the Indians also constituted in five of their own powers of attorney to transact all future land claim business. See WESLAGER, supra, 265.

Subsequently, in June 1758, Governor Francis Bernard called a general conference for all New Jersey Indians–both Munsee and Unami–to be held at Burlington later that August. See LARRABEE, supra, 9. There, he hoped to "kindle a Council fire and bury all the blood that has stained our ground, deep in the Earth, and make a new chain of peace .

. . ."  Message from Governor Francis Bernard to the Minisink Indians, *in* IX DOCUMENTS RELATING TO THE COLONIAL HISTORY OF THE STATE OF NEW JERSEY, 1757-1767, 125-26 (Daily Advertiser Printing House 1885) (hereinafter "NJ COLONIAL DOCUMENTS").  At the conference, the Delawares proposed to cede their rights to the aforementioned twenty-two tracts in exchange for a permanent and secure reservation for their community. LARRABEE, supra, 9.  However, a final resolution would have to wait because one of the Munsee advisers, who actually was an Iroquois, preferred the discussions to continue at the so-called "Forks of the Delaware," near Easton, Pennsylvania.[13]  WESLAGER, supra, 266-67.

Meanwhile, New Jersey's legislature voted to pay the costs of the two Crosswicks conferences, the Burlington conference, and the forthcoming Easton conference. LARRABEE, supra, 9.  More importantly, on August, 12, 1758, it approved the expenditure of £1,600 for the settlement of all Indian claims in the colony.  Id.; KRAFT, supra, 466. Half of that amount was specifically authorized for the "Purchase of Claims of the Delaware Indians now inhabiting near Cranberry [sic], and to the Southward of Raritan River."  Act of August 12, 1758, *An* ACT *to empower certain Persons to purchase the*

---

13      The reason for the presence and influence of an Iroquois adviser at a conference concerning mainly the Lenape Indians is complicated.  For the purposes of this Opinion, however, it is sufficient to understand that by the late seventeenth century, the Lenape people had been somewhat subjugated by the Iroquois as part of a pact called the Covenant Chain.  This multi-tribe alliance required the Lenape to seek assistance from the Iroquois in matters such as treaties, land sales, and other important transactions.  See KRAFT, supra, 434-35; LARRABEE, supra, 4.

Claims *of the* Indians *to Land in this Colony*, Ch. CCCV, Session Laws XXXII George II

A.D. 1758, *in* ACTS OF THE GENERAL ASSEMBLY OF THE PROVINCE OF NEW JERSEY 220

(Allison 1776) (hereinafter "Act of August 12, 1758") (italics in original deleted).  These

Indians did not want an outright cash payment, however.  Instead, they desired "to have

Part of the Sum allowed them laid out in Land whereon they may settle and raise their

necessary Subsistence[.]"  Id.  The law therefore directed five commissioners to purchase

land for the use of the "Said Indian Natives, who have or do reside in this Colony, South

of Raritan, and their Successors for-ever [sic]."  Id. at 221 (italics in original deleted).

The commissioners fulfilled this directive two weeks later when they acquired

3,044 acres in Burlington County for £740.  WESLAGER, supra, 267.  On September 12,

1758, the five Indian agents, who were appointed by the Delawares after the second

Crosswicks conference, "executed an indenture which conveyed on behalf of the group

they represented . . . all remaining rights in the southern portion of the colony," in

exchange for the new land.  LARRABEE, supra, 10.

These transactions were made official at the Easton conference, which was held

October 8-26, 1758.  Id.  This meeting was really a "general peace settlement between the

imperial government and its colonies on one hand and the disaffected Indians of western

Pennsylvania and the Ohio country."  Id.  Indeed, it was attended by over 500 Indians

representing the Six Nations–Nanticoke, Tutelo, Unami, Munsee, Mahican, and Pompton.

WESLAGER, supra, 268.  However, it also served as "the final ratification of the cession of

all Indian land claims in New Jersey." LARRABEE, supra, 10.  To this end, the indenture of September 12, 1758 was confirmed in a memorandum signed by various Delaware leaders and their Iroquois advisers.  Id.  Additionally, the Munsees, most of whom had already moved west, relinquished their land claims in northern New Jersey for the price of 1,000 Spanish dollars.[14]  See KRAFT, supra, 466.  A formal treaty—the Treaty of Easton—was thereafter ratified with the exchange of wampum belts and other gifts.  Id. at 468.  Thus, New Jersey was free of the Indian claims with which it was previously burdened.  All that remained was to "settl[e] the Cranbury-Crosswicks band of Lenape in their new community[,]" LARRABEE, supra, 11, which Governor Bernard quickly named Brotherton, WESLAGER, supra, 270.

Shortly after the reservation's purchase, Governor Bernard gave notice "that All Indians that propose to reside in this Province . . . must resort to [Brotherton]."  Letter from Governor Francis Bernard to the Lords of Trade (Oct. 31, 1758), in NJ COLONIAL DOCUMENTS, supra, 140.  Some Indians refused this request and instead lived off reservation in their own communities, "frequently as freeholders, craftsmen, or farm workers."  KRAFT, supra, 469-70.  However, "a majority of the approximately 270

---

14     As its name suggests, the Stockbridge-Munsee has a historic affiliation with the Munsee Indians.  However, no party has presented evidence suggesting this affiliation was with the Munsee bands involved in the Easton conference.  Instead, the "Munsee" in "Stockbridge-Munsee" appears to have come about when a group of Munsees which had previously gone to Canada joined the Stockbridge Indians in Wisconsin in 1837.  See T.J. Brasser, Mahican, in 15 HANDBOOK OF NORTH AMERICAN INDIANS 198, 210 (Smithsonian Inst. 1978).  In any event, the Stockbridge-Munsee's claim of successorship in this case is not premised on the tribe's relationship with any Munsees, but rather on its merger with the Brotherton Delaware.

16

Lenape of central New Jersey, loosely referred to as the Crosswicks-Cranbury band, were now at Brotherton[.]"  LARRABEE, supra, 13.

Unfortunately, the promise of peace and security for the Indians at Brotherton failed to materialize as planned; the land was not sufficiently productive and colonists in the surrounding areas continued to harass the group.  KRAFT, supra, 470-71. Additionally, the Brothertons experienced difficulty in paying for supplies, particularly because the New Jersey government failed to provide any financial assistance.  Id. at 471. Circumstances deteriorated so much that by 1775 the Indians there were in a state of abject poverty and near starvation.  Id.  From this point on, the Brotherton community declined in numbers and morale.  LARRABEE, supra, 14.  After a series of abortive attempts to sell the land and move west, see WESLAGER, supra, 271-73, the Brotherton group finally decided it was time to leave, KRAFT, supra, 471.

Around the turn of the nineteenth century, the Brotherton Delaware accepted an invitation to join the Stockbridge Indians who resided in New Stockbridge, New York.[15]

_____

Weslager elaborates on the nature of this invitation:

> In a speech made before members of the New Jersey Historical Society, January 21, 1875, Samuel Allinson said that in 1832 he had seen a copy of this invitation, which could no longer be found, and that the Stockbridges urged the Brotherton people to "pack up their mat" and "come and eat out of their dish," adding that "their necks were stretched in looking toward the fireside of their grandfather till they were as long as cranes."

WESLAGER, supra, 274.  Weslager adds that the Brothertons may have accepted this invitation at the behest of some members who, like most Stockbridge, were of Mahican ancestry.  See id.

WESLAGER, supra, 274.  They therefore petitioned the New Jersey government in 1801 to sell Brotherton and give them the proceeds to finance this move.  Id.

The New Jersey legislature acted favorably on this request.  On December 3, 1801, it passed a bill authorizing the sale of the Brotherton Reservation, the preamble to which states:

> Whereas the Commissioners appointed by law to superintend the affairs of the Indian Natives, at Brotherton, have by their memorial, set forth that it is the desire of said Indians to dispose of their interest in the property held in trust for their use, in the county of Burlington, and remove to the settlement of New-Stockbridge, in the State of New York: And whereas it appears by the petition of said Indians at Brotherton, and the correspondence between them and the Indians at New-Stockbridge, that it is their desire to be enabled to accomplish an union, which would be agreeable and beneficial: and whereas it is the desire, and duty of the Legislature, to adopt such measure as would promote the happiness and comfort of the said Indians:-

Act of December 3, 1801, *An ACT to constitute and appoint Commissioners to sell and convey certain Lands held in Trust for the Indian Natives at Brotherton, in Evesham Township, in the County of Burlington, and to appropriate the Monies thence arising for the Benefit of the said Indians*, Ch. LXIII, *in* ACTS OF THE TWENTY-SIXTH GENERAL ASSEMBLY 132 (Mann & Wilson 1801) (hereinafter "Act of December 3, 1801").  To this end, the legislation directed the commissioners to subdivide and sell the land, so long as they first reported to the governor that three-fourths of the adult Brotherton Indians consented to the sale.  Id. at 133-34.  The commissioners were then to distribute the sale

proceeds to the Indians to finance their move, as well as to purchase clothing, tools, and furniture.  See id. at 132.  If any portion of the proceeds went unused, the commissioners were directed to purchase and hold United States government securities for the Indians. See id. at 133.  Finally, the bill instructed the commissioners "to obtain . . .  sufficient evidence of the admission of the said Indians of Brotherton, into the tribe at Stockbridge." Id.

Thereafter, the commissioners met with the Brothertons and obtained consent for the sale from forty-six out of the sixty-three adults then living on the reservation.  See LARRABEE, supra, 17.  Although this was two votes short of the required three-fourths proportion, the commissioners reported to the governor that the necessary threshold of consent was reached, and the governor accepted this representation.  Id.  The commissioners then divided the land into thirty-four numbered lots, id., and sold them for prices ranging from two to five dollars per acre, WESLAGER, supra, 274-75.  In keeping with the Act of December 3, 1801, a portion of the proceeds was given to the Indians to finance their move and purchase various supplies.  See KRAFT, supra, 472.  The remainder of the money was invested in United States government securities on their behalf.  Id.

The commissioners' final report to the legislature indicates they accompanied more than three-fourths of the Brotherton Indians, or eighty-three people in all, to New

Stockbridge.[16]  See Minutes of the General Assembly, November 23, 1802, *in* VOTES AND PROCEEDINGS OF THE TWENTY-SEVENTH GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY 93 (Sherbun & Mershon 1802).  Moreover, the commissioners reported that the Stockbridge Indians held a council meeting in which they delivered speeches and presented wampum to the commissioners as "a pledge of friendship, and as a security for the Lands and privileges given by the Said New Stockbridge tribe of Indians, to the Delaware tribe . . . ."  Id.

According to one researcher, "[w]ith this move . . . , the Brotherton Indians of New Jersey lost their tribal identity . . . ."  KRAFT, supra, 472.  This appears to be an accurate description, as the merger of the Brothertons into the Stockbridge tribe is well documented.  For example, a Stockbridge missionary named John Sergeant recorded in his diary in October 1804 that he witnessed a council meeting during which leaders of the Brotherton Delaware expressed their gratitude to the Stockbridge for being admitted into their tribe, after which the Indians exchanged strings and belts of wampum.  See John Sergeant, Journal of John Sergeant, Missionary to the Stockbridge Indians from the Society in Scotland for Propagating Christian Knowledge (unpublished journal, held in the Rauner Special Collections Library at Dartmouth College).  Likewise, an 1824 New

---

16      This figure is generally consistent with historian Samuel Allinson's 1875 report that between seventy and eighty Brothertons moved to New Stockbridge.  See LARRABEE, supra, 17.  Moreover, as Larrabee notes, "these numbers are within the range of the size of the Brotherton community during most of its existence, and of the Bethel group at Cranbury which seems to have formed the core of those founding Brotherton."  Id.

York law recognized that the Brotherton Indians had been incorporated into the Stockbridge and authorized "the Stockbridge and Delaware Indians that have been adopted into the Stockbridge tribe, to meet in general council and . . . appoint peace-makers and [a] town clerk . . . ."  Act of April 7, 1824, *AN ACT to provide for the appointment of Peace-Makers and Town Clerk for the Stockbridge Indians, and for other purposes*, Ch. CLXXVII, *in* LAWS OF THE STATE OF NEW YORK PASSED AT THE FORTY-SEVENTH SESSION OF THE LEGISLATURE 195 (Leake & Croswell 1824).

The Stockbridge and Brotherton Delaware's dealings with one another later in the nineteenth century also reflect the merger of the latter into the former at the turn of the century.  In 1822, the Brothertons successfully petitioned New Jersey's legislature to place the balance of the money raised by the sale of the reservation into a Utica, New York bank.  See Act of November 28, 1822, *AN ACT respecting the Brotherton Indians*, *in* ACTS OF THE FORTY-SEVENTH GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY 98-99 (Justice 1823).  This money was then used to jointly finance a western move, first to the White River in Indiana, then to a tract near Green Bay, Wisconsin.  WESLAGER, supra, 275; KRAFT, supra, 472-74; LARRABEE, supra, 17.  In preparation, the leaders of the Stockbridge and the Brotherton Delaware entered into a formal merger agreement, confirming equal rights in their new lands:

> Articles of agreement made [and] entered into at Vernon in the state of New York this 23rd day of September in the year one thousand eight hundred and twenty three between . . .

chiefs and head men of the Delaware tribes of Indians formerly from the state of New Jersey of the one part & . . . chiefs and head men of the Muhheconnuk Tribe commonly called the Stockbridge Indians of the other part. Witnesseth article first that the Muhheconnuk Tribe or nation of Indians . . . do hereby cede grant bestow to said Brotherton Indians and to their scattered brethren in the state of New Jersey to them and to their offspring stock & Kindred forever an equal right title interest claim with us the said Muhheconnuk Tribe or nation of Indians and are to be considered as a component part of the Muhheconnuk or Stockbridge nation to all the lands comprehended within and discribed [sic] in the two treaties made at Green Bay with the six nations & the St. Regis Stockbridge Munsee nations of Indians [on August 18, 1821] . . . . Article second In consideration of the aforesaid granted and bargained premises which the said Muhheconnuk tribe or nation of Indians hereby promise covenant & agree to warrant and defend to said Brotherton Indians and to their progeny forever said Brotherton do hereby promise & agree to pay unto the said Stockbridge Indians [$1,000].

*Lands for Stockbridge and Brothertown [sic] Indians*, *in* XV COLLECTIONS OF THE STATE HISTORICAL SOCIETY OF WISCONSIN 6-8 (Democrat Printing Co. 1900).

The Brotherton Indians' last official contact with the State of New Jersey came in 1832. By this point, about forty descendants of the original Brotherton group lived with the Stockbridge in Wisconsin. LARRABEE, supra, 7. They sent an emissary named Bartholomew Calvin back to New Jersey to represent them in a final settlement of their rights with the state. WESLAGER, supra, 275. Although they had received full payment for the sale of the reservation, the Brothertons insisted that they still owned hunting and

fishing rights in southern New Jersey.[17]  Id.  The object of sending Calvin was to

negotiate a cash settlement in exchange for the Indians' relinquishment of these rights.

Id.  The legislative committee to which this request was referred concluded that, although

there was no legal obligation to do so, payment should be made "'as a memorial of

kindness and compassion.'"  Id. at 276 (citation omitted in original).  The legislature

therefore appropriated $2,000 for the Indians in exchange for a deed acknowledging they

had no further land rights in the state.  See id. at 276-77.  As one researcher puts it, "With

this grant the last official Delaware connection with the State of New Jersey was

severed."  KRAFT, supra, 474.

Although one might assume that the departure of the Brothertons in 1802 meant

the last of the Delaware Indians had left New Jersey, this was not the case.  WESLAGER,

supra, 277.  Instead, "some families or individuals remained, and have left descendants."

LARRABEE, supra, 17.  These scattered remaining people "contributed genetic material

and some cultural memories to mixed racial groups in New Jersey."  Goddard:1, supra,

222.  Weslager elaborates on this point:

> Some married white spouses and their children became
> members of white society; others were absorbed into the
> black population; and still others contributed Indian blood to
> the tri-racial groups that may still be found in the East, like

---

17      These rights had been reserved to the Delaware in the Act of August 12, 1758, which
explained "[t]hat no Conveyance to be made . . . by the Indians shall prejudice any Right they
now have to hunt on any uninclosed [sic] Lands, or fish in the Rivers and Bays of this Colony."
Act of August 12, 1758, supra, 221.

the so-called Moors of Delaware and New Jersey, and the
GoULDTOWNERS of New Jersey.

WESLAGER, supra, 277.  Nonetheless, "[a]fter 1802 there were no recognized groups of

Indians in New Jersey . . . ."  LARRABEE, supra, 17.  Rather, "the Lenape as such were

gone . . . ."  Id.

## II.  DISCUSSION

Having identified the relevant historical documents, it appears that the

successorship question involves a two-part inquiry.  First, the intended beneficiary of the

Brotherton Reservation must be identified because the various conferences leading to

reservation's creation were attended by, and concerned the rights of, Indians from many

different tribal and band affiliations.  Second, the relevant tribal succession principles

must be identified and applied to the facts and evidence in this case.  As discussed below,

this two-step analysis reveals that the Brotherton Reservation was created to benefit New

Jersey's remaining Unami Lenape, particularly the group residing at Cranbury and

Crosswicks.  However, neither the Stockbridge-Munsee nor Plaintiff has submitted

sufficient documentation to show it succeeded this group.

### A.  For Whom was the Brotherton Reservation Created?

In most tribal succession cases, there is little question as to the entity a modern

tribe purports to succeed.  This case is different, however, because representatives from

many different tribes and bands, some of which had already left New Jersey, were

24

involved in the negotiations leading to the creation of Brotherton.  A threshold question therefore exists as to the reservation's intended beneficiary.

As previously discussed, the Act of August 12, 1758, which authorized the purchase of Brotherton, appropriated £1,600 for the settlement of Indian land claims in New Jersey.  Half of this amount was dedicated to purchasing the rights claimed by "the Delaware Indians now inhabiting near Cranberry [sic], and to the Southward of Raritan River."  Act of August 12, 1758, supra, 220 (italics in original deleted).  But the law recognized that these Indians wanted "to have Part of the Sum allowed them laid out in Land whereon they may settle and raise their necessary Subsistence[.]"  Id. Commissioners were therefore directed to purchase land for the use of the "Said Indian Natives, who have or do reside in this Colony, South of Raritan . . . ."  Id. (italics in original deleted).

The statutory language itself shows Brotherton was purchased as a homeland and settlement for the Indians who lived south of the Raritan River.  To the colonists, this surely meant the Unami Lenape.  See KRAFT, supra, 4, 7 (explaining that Indians south of the Raritan Valley spoke the Unami dialects and that colonists therefore often referred to all Indians in that area as "Unami").  Larrabee's work confirms this understanding: "The center of the province had been inhabited by the Unami, the main division of the Lenape.

It is the remnant group in this area which was the occasion for Brotherton, so we can assume that they were Unami Lenape." LARRABEE, supra, 4 (citations omitted).

Plaintiff agrees with this basic conclusion, but suggests Brotherton was intended to benefit all Unami speakers as individuals, rather than any particular Unami political entity.[18] See Pl. Br., p. 4-5. The statutory reference to "the Delaware Indians now inhabiting near Cranberry" seems to refute this position, however, and suggests instead that Brotherton was specifically intended to benefit the so-called Cranbury band, which, by the mid-eighteenth century, had largely been transplanted from its original settlement at Crosswicks. Larrabee's work supports this conclusion; he noted, for example, that the Delaware at the second Crosswicks conference were represented primarily by Indians from Cranbury and Crosswicks, and referred to them as a "distinct group" which had resided in "the central area of the province."[19] LARRABEE, supra, 8. Larrabee also wrote that, after having purchased Brotherton, [t]here remained now the problem of settling the Cranbury-Crosswicks band of Lenape in their new community." Id. at 10. Later in his

_____

[18]    Plaintiff has been somewhat inconsistent in maintaining this position. On the one hand, it claims in its brief opposing the Stockbridge-Munsee's motion that Brotherton was not created for a particular group of Indians. On the other hand, its principal tribal officer, James Brent Thomas, seems to acknowledge that the reservation was intended to benefit a distinct group of Delaware Indians, which he identifies as the "Brotherton Tribe." See, e.g., Thomas Ltr. to the Court, 2/1/07, p. 7; Thomas Ltr. to the Court, 5/30/07, p. 7.

[19]    It should be remembered that Crosswicks and Cranbury were both located in central New Jersey with the former being about ten miles southeast of Trenton and the latter being about fifteen miles northeast of the former. See WESLAGER, supra, 262-63.

work, he highlighted the fact that "a majority of the approximately 270 Lenape of central New Jersey, loosely referred to as the Crosswicks-Cranbury band, were now at Brotherton . . . ." <u>Id.</u> at 13.

Additionally, this group's mistreatment and hardship, first at Crosswicks and then at Cranbury, appears to have been a primary motivation for the creation of a secure reservation in the first place. <u>See</u>, <u>supra</u>, pp. 9-11. Indeed, the first Crosswicks conference revealed that New Jersey's problem relating to Delaware lands stemmed from the fear among the Indians at Cranbury and, to a lesser extent, Crosswicks that white settlers would displace them from their homes. <u>See</u> WESLAGER, <u>supra</u>, 265. This further suggests the reservation was intended primarily for this distinct group.

Although Brotherton was intended to benefit the Unami generally and the Cranbury-Crosswicks group in particular, it was, as a practical matter, open to all Indians–northern and southern alike. Indeed, the provincial government conditioned all remaining Indians' continued residence in New Jersey on their relocation to the reservation. In a letter to the Lords of Trade, Governor Francis Bernard described the outcome of the Easton conference and the establishment of Brotherton:

> In regard to the Southern claim the Indian Attornies [sic] agreed to accept of Lands for them to settle on in lieu of the lands claimed by them. And accordingly a tract containing 3000 Acres has been purchased & conveyed to me & the Commissioners in trust for the Indians etc [sic] in consideration of which they have released all their claims to

> the lands Southward of the Raritan. *And notice has been given that All Indians that propose to reside in this Province (which according to exact return made to me are now about 270) must resort to that tract of land . . . .*

Letter from Governor Francis Bernard to the Lords of Trade (Oct. 31, 1758), *in* NJ COLONIAL DOCUMENTS, supra, 140 (emphasis added).  Several months later, Governor Bernard sent the Lords another letter in which he described a visit he made to Brotherton during which he met with the band's leaders:

> I went to Burlington County to lay out the Indian Town there. I have before informed your Lordships that by agreement with the Indians south of Raritan [sic]  They released all their claims in the province, in consideration of a tract of 3000 Acres to be purchased for their use.  This purchase was made & the Indians are removed to the place . . . .  To this place I went with 3 of the Commissioners for Indians affairs, where we laid out the plan of a town . . . .  *The next day I had a conference with the chiefs*, at which they expressed great satisfaction at what had been done for them . . . .

Letter from Governor Francis Bernard to the Lords of Trade (June 15, 1759), *in* NJ COLONIAL DOCUMENTS, supra, 174-75 (emphasis added).  This latter correspondence demonstrates not only that the Indians relocated to the new reservation, but also that they formed or maintained a governmental structure with leaders of sufficient standing to confer with the provincial governor.  In other words, they were more than an unaffiliated collection of individual Unamis; they were, at some level, organized into a political

entity.  This stands to reason given that the Cranbury-Crosswicks band, which formed the core of the Brothertons, appears itself to have been a distinct group.

That the Brotherton Delaware constituted a political entity is further demonstrated by its subsequent dealings with the New Jersey government.  The group, on numerous occasions, formally petitioned the provincial and state legislatures to take various courses of action on its behalf.  In 1762, for example, it sought financial assistance for the reconstruction of a destroyed mill.  See LARRABEE, supra, 14.  Seven years later, it formally requested approval for a scheme to lease reservation land to non-Indians.  See id. at 15.  And in 1801, of course, the group successfully petitioned to sell the reservation altogether.  See WESLAGER, supra, 274.

Thus, Brotherton was intended to benefit primarily the Unami group at Cranbury and Crosswicks.  Moreover, this group and the other Indians who joined them at Brotherton acted and were treated as a distinct entity, rather than a mere collection of

individuals.[20] The question now is whether the Stockbridge-Munsee and/or Plaintiff

succeeded the Brotherton group or the Cranbury-Crosswicks Indians who formed its core.

B.  Which Modern Tribe, if Any, is a
Successor in Interest to the Brotherton Delaware?

Both the Stockbridge-Munsee and Plaintiff claim to be successors in interest to the

Brotherton Delaware, albeit under different theories of successorship and for different

tactical reasons.  On the one hand, the Stockbridge-Munsee claims it is the sole successor

to the Brothertons because the main body of the group migrated to New York in 1802 and

merged its body politic with that of the Stockbridge Indians.  It therefore contends it is a

necessary and indispensable party in whose absence this litigation cannot proceed.

Because it declines to waive its sovereign immunity, it maintains that this action must be

dismissed.

On the other hand, Plaintiff claims ancestral ties to Indians who resided in southern

New Jersey during the relevant period.  It therefore claims to be the modern incarnation

---

20    The *amicus curiae* NJLTA notes some historical evidence which suggests that the
Brotherton Delaware may have disintegrated as an organized tribal entity at some point after the
establishment of the reservation, but before the 1801 sale.  See NJLTA Br., 3/21/07, pp. 12-18.
This could arguably weigh on whether the group's successor–whoever that may be–can
ultimately prevail against the State in an Indian Nonintercourse Act case.  See Mashpee Tribe v.
New Seabury Corp., 592 F.2d 575, 579 (2d Cir. 1979) (explaining that a plaintiff must have been
a tribe at the time of the alleged unlawful alienation in order to be protected by the Indian
Nonintercourse Act).  More importantly, according to the NJLTA, the Brotherton Delaware's
questionable tribal status also casts doubt on whether any modern tribe can be held to have
succeeded that group.  Ultimately, the Court need not decide this issue because, even assuming
the Brotherton group continued to be a tribal entity throughout the relevant period, neither
Plaintiff nor the Stockbridge-Munsee has shown itself to be that group's successor.

30

of the Brotherton Delaware.  Because its suit is based on the alleged violation of the

Brotherton group's rights in the reservation, Plaintiff must prove it is the group's

successor in order to have standing to bring this action.  Therefore, both the Stockbridge-

Munsee and Plaintiff's successorship arguments must be analyzed in keeping with the

legal principles governing this question.

1.  Legal Principles Governing Tribal Succession

The Court of Appeals for the Third Circuit has not yet identified a legal standard

governing Indian tribal successorship.  Other courts, however, have written persuasively

on the question.

An Indian tribe's rights under a treaty vest with the tribe at the time it signs the

treaty.  United States v. Oregon, 29 F.3d 481, 484 (9th Cir. 1994).  A group of Indians

claiming to be the modern incarnation of a treaty tribe may later assert that tribe's rights if

it establishes that it has preserved its tribal status.  Id.  This requires more than merely

tracing the modern group's ancestry to the original tribe.  See United States v. Suquamish

Indian Tribe, 901 F.2d 772, 776 (9th Cir. 1990).  Tribal status will be preserved only if

the modern group has descended from the treaty signatory and has maintained an

"organized tribal structure."  United States v. Washington, 641 F.2d 1368, 1371 (9th Cir.

1981).  Whether these conditions are met is a question of fact which can be answered by a

district court.  Id.

In order to maintain an organized tribal structure, and thus prove tribal status, a modern Indian group must establish that "some defining characteristic of the *original tribe* persists in an evolving tribal community." Id. at 1372-73 (emphasis added). In attempting to carry this burden, there is no need for the modern group to have acquired organizational characteristics that the original tribe did not possess. See id. at 1373 ("A structure that never existed cannot be 'maintained.'"). Moreover, a "degree of assimilation" attributable to adaptation will not destroy a group's tribal status. Id. "When assimilation is complete, [however,] those of the group purporting to be the tribe cannot claim tribal rights" because "tribes must survive as distinct communities."[21] Id.; see also Mashpee Tribe, 592 F.2d at 586 (quoting with approval a district court's jury instruction which read, "assimilation is simply a way of expressing the reverse of the existence of an Indian community").

In the Washington case, the Court of Appeals for the Ninth Circuit applied these principles when it considered whether several groups of Indians were the modern incarnation of a tribe that had previously signed a treaty pertaining to fishing rights. The court held that the modern groups were not successors to the treaty tribe because they

---

21      In the course of determining whether a tribe has survived as a "distinct community," one court has observed that "an Indian community is something different from a community of Indians. That is to say, it has some [intangible] boundary that separates it from the surrounding society, which is perceived as Indian and not merely as neighborhood or territory." Mashpee Tribe, 592 F.2d at 586 (quoting with approval a district court's jury instruction).

"had not functioned since treaty times as 'continuous separate, distinct and cohesive Indian cultural or political communities.'" <u>Washington</u>, 641 F.2d at 1373 (citation omitted).  Although, by the time of the case, the modern groups had developed constitutions and formal governments, there was no indication of continuous governmental control over their members' lives.  <u>Id.</u>  Nor did the groups demonstrate any continuous cultural influence of the original treaty tribes.  <u>Id.</u>

Importantly, the successorship standard identified in <u>Washington</u> has also been applied in the context of a modern tribe's attempt to assert the treaty rights of another tribe altogether.  <u>See Suquamish</u>, 901 F.2d at 776.  In other words, the modern tribe must be comprised of descendants of the original treaty tribe and must show that "'some defining characteristic of the original tribe persists in an evolving tribal community.'"  <u>Id.</u> (quoting <u>Washington</u>, 641 F.2d at 1372-73).  Additionally, the modern tribe must establish that "there has been a consolidation or merger of the tribes, or cohesive bands thereof, sufficient to combine their tribal or political structures."  <u>Id.</u> (citation omitted).  Thus, the <u>Suquamish</u> court rejected a plaintiff tribe's attempt to exercise the fishing rights of another tribe because the plaintiff did not sufficiently show that a cohesive band of the other tribe had determined to unite with it.  <u>See id.</u> at 777.

The Stockbridge-Munsee and Plaintiff's respective claims of successorship to the Brotherton Delaware will be analyzed in keeping with these principles.

2.  Analysis of the Stockbridge-Munsee's Successorship Claim

The Stockbridge-Munsee's motion to dismiss under Federal Rule 19 is rooted in its contention that it is a successor to the Brotherton Delaware.  However, its successorship argument appears to rest entirely on the Brotherton group's merger into the Stockbridge tribe in 1802.  The Stockbridge-Munsee's submissions, including the various historical documents and treatises attached thereto,[22] show that the main body of the Brotherton Delaware transferred whatever political attributes it had to the Stockbridge tribe.  In other words, the historical record appears to support the conclusion that the Brothertons merged into the Stockbridge tribe.  Nonetheless, the Stockbridge-Munsee's successorship argument fails, not because it lacks evidentiary support for its merger claim, but because it makes no showing with respect to the remainder of the test identified in Washington and Suquamish.

Simply showing merger and nothing more will not satisfy the standard for tribal successorship.  Rather, a tribe in the Stockbridge-Munsee's position–that is, a tribe attempting to assert the rights of another tribe–must show merger in addition to, not in lieu of, showing the persistence of one or more defining characteristics of the original tribe in an evolving tribal community.  See Suquamish, 901 F.2d at 776; Washington, 641 F.2d at 1372-73.  Although the Stockbridge-Munsee points to its own federal recognition

---

22      These historical documents and treatises were cited and discussed at length in section I.B., supra.

and states that it has maintained "a continuous tribal political existence," Stockbridge-Munsee Br., p. 17, this does not show that any defining characteristic of the Brotherton group, or the Cranbury-Crosswicks band which made up its core, persists in an evolving tribal community. See Washington, 641 F.2d at 1371 (indicating that federal recognition does not impact the tribal successorship analysis). As a result, this Court cannot conclude that the Stockbridge-Munsee is a successor to the Brotherton Indians.

Because the Stockbridge-Munsee's sole grounds for claiming an interest in the Brotherton Reservation is its theory of successorship, it logically follows that it does not have an interest in this litigation. Cf. Oregon, 29 F.3d at 487 (affirming a district court's denial of a modern tribe's motion to intervene where it was unable to show that it was a successor in interest to the original tribe whose rights it sought to assert). It is, therefore, not a necessary and indispensable party under Rule 19, and its refusal to be joined does not warrant dismissing this action. Accordingly, its motion to dismiss is denied.

### 3.  Analysis of Plaintiff's Successorship Claim

In addition, Plaintiff, like the Stockbridge-Munsee, does not sufficiently demonstrate that it is a successor to the Brotherton Delaware. This raises an important question: does Plaintiff therefore lack standing to assert a violation of the Brotherton group's rights?[23]

---

23    Although no party has challenged Plaintiff's standing, courts are "required to raise issues of standing *sua sponte* if such issues exist." Addiction Specialists, Inc. v. Twp. of Hampton, 411 F.3d 399, 405 (3d Cir. 2005).

The Supreme Court has identified three constitutionally-based standing requirements: 1) injury-in-fact; 2) traceability; and 3) redressability.  See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  Additionally, there are several prudential limitations, including the requirement that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  Warth v. Seldin, 422 U.S. 490, 499 (1975) (citations omitted).

Moreover, to have standing under the Indian Nonintercourse Act, a plaintiff must show that it is or represents an Indian tribe.  See Oneida Indian Nation v. New York, 194 F. Supp. 2d 104, 117 (N.D.N.Y. 2002) (citing Golden Hill Paugussett Tribe of Indians v. Weicker, 39 F.3d 51, 58 (2d Cir. 1994)).  The traditional test for determining whether a plaintiff constitutes an Indian tribe was set out in Montoya v. United States, 180 U.S. 261, 266 (1901), wherein the Supreme Court stated: "By a 'tribe' we understand a body of Indians of the same or similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory . . . ."[24]

Plaintiff alleges it satisfies the Montoya standard and therefore is a tribe within the meaning of the Indian Nonintercourse Act.  See Am. Compl. ¶¶ 18-19.  But proving tribal successorship also appears to be an important component of satisfying standing, at least in cases where a group of Indians claims to be the modern incarnation of an original treaty

---

[24]    Although Montoya did not involve the Indian Nonintercourse Act, this definition has been applied in cases brought under that statute.  See, e.g., Mashpee, 592 F.2d at 582.

36

tribe.  See Oneida Indian Nation, 194 F. Supp. 2d at 117-21 (striking a standing defense in an Indian Nonintercourse Act case where the plaintiff Indian tribes had previously established that they were successors in interest to the original tribe whose rights were violated); cf. Washington, 641 F.2d at 1372 (stating that modern Indian groups could exercise treaty rights as tribes "only if they are the tribes that signed the treaties").  It is therefore not enough for Plaintiff to be *an* Indian tribe; instead, it must be *the* Indian tribe–namely, the Brotherton Delaware.  Otherwise, Plaintiff's claim impermissibly rests on the legal rights of a third party.

Although Plaintiff submits several documents and treatises in connection with its successorship claim, nothing in its various submissions shows that it has descended from the Brotherton Delaware, or the Cranbury-Crosswicks band that formed its core.  Likewise, Plaintiff does not demonstrate the maintenance of the Brotherton Indians' organized tribal structure.

Chief among Plaintiff's submissions on the successorship issue is a certification from a University of Pennsylvania anthropologist named Greg Urban (hereinafter "the Urban Certification").  It explains that "[t]raceable descent connects some members of [Plaintiff and a related tribe] to ancestors living in southern New Jersey in the early 18[th] century."  Urban Cert., ¶ C.1.  According to the Urban Certification, "[t]he community from which these contemporary [tribes] trace descent was a tri-racial community

generally known by the place-name 'Gouldtown.'" Id., ¶ C.2.  It also explains that Gouldtown had a significant Indian component which survived through kinship and marriage, and by refraining from overtly marking itself as Indian.  See id., ¶¶ C.4.-6.

Gouldtown is, of course, a familiar place-name in the context of New Jersey's historic Indian population.  According to Weslager, for example, some Delaware Indians who remained in New Jersey following the departure of the Brotherton group settled at Gouldtown.  WESLAGER, supra, 277.  Thus, the basic premise of the Urban Certification–that some of Plaintiff's members trace ancestral ties to Gouldtown–is certainly plausible.  Nonetheless, the Urban Certification is largely irrelevant to the legal inquiry set out in Washington and Suquamish because it fails to address whether any defining characteristic of the Brotherton group persists in Plaintiff's evolving tribal community.[25]  Likewise, the Urban Certification does not identify whether the specific Gouldtowners to whom Plaintiff's members trace lineage were actually members of the Brotherton group or the Cranbury-Crosswicks band for which the Brotherton Reservation was specifically intended.  Although ancestry alone is insufficient to demonstrate tribal successorship, it is a necessary starting point in the analysis.  See Washington, 641 F.2d

_____

25     Such a showing would, indeed, be difficult because the historical treatises largely indicate that the 1802 departure of the Brotherton Delaware spelled the end of its tribal existence in New Jersey.  For example, Larrabee wrote that, "[a]fter 1802 there were no recognized groups of Indians in New Jersey . . . ." LARRABEE, supra, 17.  Rather, "the Lenape as such were gone . . . ." Id.  Kraft agreed, and further explained that the 1802 move caused "the Brotherton Indians of New Jersey [to] los[e] their tribal identity . . . ." KRAFT, supra, 472.

at 1371 ("[T]reaty-tribe status is established when 'a group of citizens of Indian ancestry is *descended from a treaty signatory* and has maintained an organized tribal structure.'" (citation omitted)) (emphasis added).  Therefore, the Urban Certification does not support Plaintiff's successorship theory.

Plaintiff's other submissions similarly fail to establish that it is a successor to the Brotherton Delaware.  It submits, for example, a chapter on the modern revival of Indian culture from the C.A. Weslager book, THE NANTICOKE INDIANS: PAST AND PRESENT. Most of this text is irrelevant to the issue at hand, although a few paragraphs discuss generally the sale of the Brotherton Reservation and the resulting migration of the Brotherton group.  See C.A. WESLAGER, THE NANTICOKE INDIANS: PAST AND PRESENT 251 (Univ. of Del. Press 1983).  However, nothing in this document, or any of Plaintiff's other submissions, shows its descent from the Brotherton group, or its maintenance of that group's organized tribal structure.[26]  For this reason, Plaintiff, like the Stockbridge-

---

[26]     Plaintiff submits several additional documents in support of its position, but these too are largely irrelevant to the successorship issue.  For example, it directs the Court to a survey detailing archeological finds throughout southern New Jersey, see ALANSON SKINNER & MAX SCHRABISCH, A PRELIMINARY REPORT OF THE ARCAEOLOGICAL SURVEY OF THE STATE OF NEW JERSEY (MacCrellish & Quigley 1913), and a collection of historic New Jersey maps, see JOHN P. SNYDER, THE STORY OF NEW JERSEY'S CIVIL BOUNDARIES 1606-1968 (1st ed. 1969).  It also points to a 1982 state legislative enactment recognizing the Confederation of Nanticoke-Lenni Lenape Tribes (an organization from which Plaintiff apparently splintered) as an Indian tribal entity.  Nothing in these submissions, however, speaks to whether Plaintiff descended from, or has maintained any defining characteristic of, the Brotherton group or its primary component, the Cranbury-Crosswicks band.

Munsee, does not demonstrate that it is a successor to the Brotherton Delaware.  It therefore lacks standing to assert a violation of that group's rights.

### III.  CONCLUSION

For the foregoing reasons, the Court concludes the Stockbridge-Munsee does not sufficiently demonstrate that it is a successor in interest to the Indian group for which the Brotherton Reservation was created.  It therefore lacks an interest in this litigation and is neither a necessary nor an indispensable party.  Its motion to dismiss under Rule 19 accordingly is denied.  Nonetheless, the Court dismisses this action *sua sponte* because Plaintiff similarly fails to show that it is a successor to the Brotherton group.  An appropriate Order accompanies this Opinion.


 /s/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
United States District Judge


Dated: May 20, 2008